# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>a Samsung Galaxy S8 blue smartphone, with IMEI 357497084070488 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 2:20-MJ-03460 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a),(e) | Production of Child Pornography |
| 18 U.S.C. § 2252A(a)(2)(A),(b)(1) | Receipt/Distribution of Child Pornography |
| 18 U.S.C. § 2252A(a)(5)(B),(b)(2) | Possession of Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days:_____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Garret Sumpter*

*Applicant's signature*

Garret Sumpter, FBI Special Agent

*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

*Judge's signature*

City and state:  Los Angeles,  CA

*Printed name and title*

AUSA:  Axelrad x7964

**AFFIDAVIT**

I, Garret Sumpter, being duly sworn, declare and state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since September 15, 2019.  I received my initial training and instruction to become a Special Agent during the 21-week-long course at the FBI Academy located in Quantico, Virginia.  During my training at the FBI Academy, I received extensive training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.

2.    After initial training, I was assigned to the Lancaster Resident Agency, Los Angeles Field Office.  I currently work a variety of criminal and national security matters, including the investigation of violent crimes against children, including the investigation of child sexual abuse material ("CSAM").  Throughout these investigations, I have become familiar with how the use of cellular telephones and electronic communications are used to assist individuals participating in criminal activity.

3.    This affidavit is made in support of a search warrant for the following item, which is currently in the legal custody

1

of FBI, Los Angeles Field Office: a Samsung Galaxy S8 blue smartphone, with IMEI 357497084070488 ("SUBJECT DEVICE").

4.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT DEVICE constitutes evidence, contraband, fruits, or instrumentalities of criminal violations, namely, production of child pornography, in violation of 18 U.S.C. § 2251(a),(e): receipt/distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A),(b)(1); and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B),(b)(2) (collectively, the "SUBJECT OFFENSES").

5.    The information set forth in this affidavit was obtained during the course of my employment with the FBI, through personal observations, subject statements, information supplied by other local and federal law enforcement officers, and through other investigative activity.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>SUMMARY OF PROBABLE CAUSE</u>

6.    From 2018 through 2019, two separate female victims, ages seven and eight, were sexually exploited by a user on the social media app "Like."  Based on the investigation that followed, law enforcement identified Luis BARRAGAN as the individual responsible for sexually exploiting these minor victims and as the user of various email accounts found to contain suspected child pornography.  In interviews with law enforcement on February 12 and 27, 2020, BARRAGAN provided consent to search the SUBJECT DEVICE and assume the online identity of various email accounts.  During a preview of the SUBJECT DEVICE and BARRAGAN's email accounts, law enforcement located more than 900 images of suspected CSAM.  Specifically, law enforcement discovered approximately 52 images of suspected child pornography during a consent search of the SUBJECT DEVICE.

## III. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   <u>New York victim on app "Like"</u>

7.    Based on my training and experience, and conversations with other law enforcement agents and officers, as well as my familiarity with this investigation, I am aware of the following:

a.    During the summer of 2018, the father of an eight-year-old female residing in Amityville, New York contacted the Federal Bureau of Investigation ("FBI") to report that his

daughter was being enticed to take pornographic images and/or videos of herself by at least one adult male on the social media app "Like."

b.    A preliminary forensic review of the victim's phone conducted by law enforcement revealed multiple images and/or videos of suspected CSAM sent from the victim on the social media app "Like."  Additionally, the review found multiple images and/or videos of an adult male masturbating as well as sexually explicit messages.  Law enforcement identified the account name "Felipe Dias" as one of the users who had contacted the victim on "Like" in an attempt to entice her to produce additional CSAM.

c.    "Like" is hosted by the company Bigo Technology Pte. Ltd., located in Singapore.  Working in conjunction with the Singapore Police Force, the United Sates Embassy in Singapore was able to obtain the IP address for the account name "Felipe Dias" from Bigo Technology Pte. Ltd.  The IP address for the account name "Felipe Dias" came back to 99.100.6.94.

d.    On November 8, 2018, in response to an administrative subpoena, AT&T returned subscriber data from IP address 99.100.6.94 which came back to Luis BARRAGAN, located at 24838 Newhall Avenue, Apt. 10, Santa Clarita, CA 91321.

### B. __Georgia victim on app "Like"__

8.   Based on my training and experience, and conversations with other law enforcement agents and officers, as well as my familiarity with this investigation, I am aware of the following:

a.   On June 4, 2019, the mother of a seven-year-old female residing in Leesburg, Georgia contacted law enforcement to report that an unknown person with the account name "Huskies" sexually exploited her daughter on the social media app "Like."

b.   On July 31, 2019, law enforcement obtained a search warrant filed in Lee County, Georgia, and in response Bigo Technology Pte. Ltd. provided IP address logs from the account name "Huskies."  According to the IP address logs, the IP address 99.100.6.94 is registered to the account name "Huskies."  Furthermore, between the dates of March 12, 2019 and July 25, 2019, the 99.100.6.94 IP address accessed the account name "Huskies" over 5,000 times.

c.   On March 9, 2020, law enforcement obtained a search warrant in Lee County, Georgia, and in response AT&T returned subscriber data from IP address 99.100.6.94 which came back to BARRAGAN, telephone number 661-644-2776, located at 24838 Newhall Avenue, Apt. 10, Santa Clarita, CA 91321.

C.   **Preview of the SUBJECT DEVICE**

9.   Based on my training and experience, and conversations with other law enforcement agents and officers, as well as my familiarity with this investigation, I am aware of the following:

a.   On February 12, 2020, law enforcement interviewed BARRAGAN outside of his residence.  BARRAGAN stated that he accessed the Internet via his home WiFi network using the SUBJECT DEVICE.  BARRAGAN stated that he used several social media apps including Snapchat, Facebook, Instagram, WhatsApp, TikTok, Funimate, and Like.  BARRAGAN stated that he used the account name "Felipe Dias" on the social media app "Like" to chat and trade pornographic images and/or videos with anonymous individuals.

b.   BARRAGAN gave both verbal and written consent for law enforcement to search the SUBJECT DEVICE.  Law enforcement subsequently located on the SUBJECT DEVICE approximately four images depicting pre-adolescent naked females exposing their vagina and buttocks.  As a result of the discovery of suspected CSAM, law enforcement seized the SUBJECT DEVICE.

c.   On May 26, 2020 and May 27, 2020, pursuant to receiving consent to search, I conducted a preview of the Cellebrite extraction files from the SUBJECT DEVICE.  Based on my preview, I identified approximately 52 images of suspected

CSAM that were located in the image folder of the SUBJECT
DEVICE.  The images of suspected CSAM included the following:

   i. A series of three images depicting two pre-
adolescent females taking turns exposing their chests;

   ii. A series of three images depicting a pre-
adolescent female exposing her chest (two images) and vagina
(one image);

   iii. A series of three images depicting a pre-
adolescent female exposing her chest (one image) and vagina (two
images);

   iv. A series of two images depicting a pre-
adolescent female bent over with her underwear pulled down
exposing her vagina and buttocks;

   v. Approximately four images depicting
different pre-adolescent females exposing their chests;

   vi. Approximately 12 images depicting different
pre-adolescent females bent over exposing their vagina and
buttocks;

   vii. Approximately six images depicting pre-
adolescent girls exposing their vaginas.

  **D.** **Preview of BARRAGAN's Google accounts**

  10. Based on my training and experience, and conversations
with other law enforcement agents and officers, as well as my

familiarity with this investigation, I am aware of the
following:

        a.   During the February 12, 2020 interview, BARRAGAN
provided consent for law enforcement agents to search and assume
the online identity of luisb843@gmail.com.

        b.   On June 3, 2020, pursuant to receiving consent to
search, I conducted a preview of luisb843@gmail.com.  During my
preview of luisb843@gmail.com, I identified approximately seven
outgoing e-mails containing suspected CSAM.  The images of
suspected CSAM included the following:

        i.   Four e-mails containing approximately 15
images and approximately four videos depicting suspected CSAM
that were sent from luisb843@gmail.com to adriandez8e@gmail.com
between approximately November 16, 2019 and December 13, 2019.
These 15 images appear to depict naked pre-adolescent females
exposing their chest, vagina, and buttocks.  The four videos
appear to depict pre-adolescent females removing their clothing
and masturbating.  One video appears to be from the social media
app "Funimate."

        ii.   Three e-mails containing approximately 23
images depicting suspected CSAM that were sent from
luisb843@gmail.com to ebarragan095@gmail.com between
approximately March 13, 2018 and March 26, 2018.  These 23

images all appear to depict the same naked pre-adolescent
female.

        c.   In a subsequent interview conducted on February
27, 2020, BARRAGAN provided consent for law enforcement agents
to search and assume the online identities for
adriandez8e@gmail.com and ebarragan095@gmail.com.

        d.   On May 27, 2020, May 28, 2020, and June 3, 2020,
pursuant to receiving consent to search, I conducted a preview
of adriandez8e@gmail.com.  During my preview of
adriandez8e@gmail.com, I identified approximately 900 images of
suspected CSAM located in the image folder.  These images appear
to depict pre-adolescent females exposing their chest, vagina,
and buttocks.  The images of CSAM had a file creation date
ranged between April 2018 and November 2019.

        e.   Most of the images of suspected CSAM in
adriandez8e@gmail.com appeared to be uploaded from an Android
device.  At least one image from adriandez8e@gmail.com
("Screenshot_20190422-155643_LIKE.jpg") appeared to match an
image found during a previous preview of the SUBJECT DEVICE.

        f.   At least two images from adriandez8e@gmail.com
("Screenshot_20190525-113751_LIKE.jpg" and "Screenshot_20190525-
113457_LIKE.jpg") appeared to match images of the seven-year-old
female victim, previously identified by the LCSO, located in
Leesburg, Georgia.  Both of these images had file creation dates

of May 25, 2019, which was approximately ten days prior to law enforcement receiving the initial victim report.  One image depicted a pre-adolescent female exposing her chest and the other image depicted a pre-adolescent female completely naked.  Furthermore, adriandez8e@gmail.com contained a screenshot from the social media app "Like" that depicted non-pornographic images resembling this same female victim.

g.   adriandez8e@gmail.com also contained numerous screenshots of sexually explicit chat conversations containing suspected CSAM.  In the chat conversations, an individual instructed various female victims to remove their clothing and engage in sexually explicit conduct.  Many of the chat conversations were conducted using the social media app "Like" and involved the user "Huskies."

h.   In one chat conversation, an unknown user asked "Do you still want some pics or no(?)" to which "Huskies" confirmed.  The user then asked "naked(?)" to which "Huskies" again confirmed.  The unknown user then sent an image depicting suspected CSAM.  In another chat conversation, an unknown user sent an image depicting suspected CSAM, to which "Huskies" replied "video finger in."  When the user sent another image of suspected CSAM, "Huskies" replied "2 fingers."

i.   In addition to the images of suspected CSAM and chat conversations, adriandez8e@gmail.com also contained non-

10

pornographic images depicting young females from approximately
75 social media accounts.  These social media platforms
included: Like, Snapchat, Instagram, and TikTok.

### IV.  <u>TECHNICAL BACKGROUND</u>

26.  In my training and experience, I have learned that
that data can quickly and easily be transferred from one digital
device to another digital device.  Data can be transferred from
computers or other digital devices to internal and/or external
hard drives, tablets, mobile phones, and other mobile devices
via a USB cable or other wired connection.  Data can also be
transferred between computers and digital devices by copying
data to small, portable data storage devices including USB
(often referred to as "thumb") drives, memory cards (Compact
Flash, SD, microSD, etc.) and memory card readers, and optical
discs (CDs/DVDs).

27.  Data can quickly and easily be transferred from one
digital device to another through the use of wired connections
(hard drives, tablets, mobile phones, etc.) and portable storage
devices (USB drives, memory cards, optical discs).  A user can
access the Internet using their assigned public IP address,
receive, transfer or download data, and then transfer that data
to other digital devices which may or may not have been
connected to the Internet during the date and time of the
specified transaction.

28.   Based on my training and experience, collectors and distributors of CSAM also use online resources to retrieve and store CSAM, including services offered by companies such as Google, Yahoo, Apple, and Dropbox, among others.   The online services allow a user to set up an account with a remote computing service that provides e-mail services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet.   Evidence of such online storage of CSAM is often found on the user's computer or smart phone.   Even in cases where online storage is used, however, evidence of CSAM can be found on a user's smart phone if that device is used to access the internet.

29.   As is the case with most digital technology, communications by way of a computer can be saved or stored on the computer used for these purposes.   Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.   Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).   In addition to electronic communications, a computer user's Internet activities generally leave traces or footprints"

and history files of the browser application used.  A forensic examiner often can recover evidence suggesting whether a computer was using Yahoo messenger, and when certain files under investigation were uploaded or downloaded.  Such information is often maintained indefinitely until overwritten by other data.

30.  Based on my training and experience, I have learned that producers of CSAM can produce image and video digital files from the average digital camera, mobile phone, or tablet.  These files can then transferred from the mobile device to a computer or other digital device, using the various methods described above.  The digital files can then be stored, manipulated, transferred, or printed directly from a computer or other digital device.  Digital files can also be edited in ways similar to those by which a photograph may be altered; they can be lightened, darkened, cropped, or otherwise manipulated.  As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute CSAM.  In addition, there is an added benefit to the CSAM in that this method of production is a difficult trail for law enforcement to follow.

31.  As part of my training and experience, I have become familiar with the Internet, a global network of computers and other electronic devices that communicate with each other using various means, including standard telephone lines, high speed

telecommunications links (e.g., copper and fiber optic cable),
and wireless transmissions, including satellite.  Due to the
structure of the Internet, connections between computers on the
Internet routinely cross state and international borders, even
when the computers communicating with each other are in the same
state.  Individuals and entities use the Internet to gain access
to a wide variety of information; to send information to, and
receive information from, other individuals; to conduct
commercial transactions; and to communicate via e-mail.

32.  As set forth herein and in Attachment B to this
Affidavit, I seek permission to search for and seize evidence,
fruits, and instrumentalities of the above-referenced crimes
that might be found at the SUBJECT DEVICE, in whatever form they
are found.  It has been my experience that individuals involved
in CSAM often prefer to store images of CSAM in electronic form.
The ability to store images of CSAM in electronic form makes
digital devices, examples of which are enumerated in Attachment
B to this Affidavit, an ideal repository for CSAM because the
images can be easily sent or received over the Internet.  As a
result, one form in which these items may be found is as
electronic evidence stored on a digital device.

33.  Based upon my knowledge, experience, and training in
CSAM investigations, and the training and experience of other
law enforcement officers with whom I have had discussions, I

know that there are certain characteristics common to individuals involved in CSAM:

a.    Those who possess, distribute, receive and attempt to receive CSAM may receive sexual gratification, stimulation, and satisfaction from contact with children whether for themselves or as in this investigation as bait in an effort to troll for romantic encounters on line; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.    Those who possess, distribute, receive and attempt to receive CSAM often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the individual's residence, to enable the collector to view the collection, which is valued highly.

c.    Those who possess, distribute, receive and attempt to receive CSAM also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other CSAM distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone

15

numbers of individuals with whom they have been in contact and who share the same interests in CSAM, again as in this case when the interest in CSAM appears to be used as tool in an effort to troll for romantic relationships online.

> d.  Those that possess, distribute, receive and attempt to receive CSAM prefer not to be without their CSAM for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of CSAM throughout the world.

34.  Based on my training and experience, and my consultation with computer forensic examiners who are familiar with searches of computers and smartphones, I know that in some cases the items set forth in Attachment B may take the form of files, documents, and other data that is user-generated and found on a digital device.  In other cases, these items may take the form of other types of data - including in some cases data generated automatically by the devices themselves.

35.  Based on my training and experience, and my consultation with computer forensic examiners who are familiar with searches of computers and smartphones, I believe that there is probable cause to believe that the items set forth in Attachment B will be stored in the SUBJECT DEVICE for a number of reasons, including but not limited to the following:

a.   Once created, electronically stored information (ESI) can be stored for years in very little space and at little or no cost.  A great deal of ESI is created, and stored, moreover, even without a conscious act on the part of the device operator.  For example, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache," without the knowledge of the device user.  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes affirmative steps to delete them.  This ESI may include relevant and significant evidence regarding criminal activities, but also, and just as importantly, may include evidence of the identity of the device user, and when and how the device was used.  Most often, some affirmative action is necessary to delete ESI.  And even when such action has been deliberately taken, ESI can often be recovered, months or even years later, using forensic tools.

b.   Wholly apart from data created directly (or indirectly) by user-generated files, digital devices - in particular, a smartphone - contains electronic evidence of how a digital device has been used, what is has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating systems or

application operations, file system data structures, and virtual memory "swap" or paging files.  Computer and smartphone users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible for a user to use such specialized software to delete this type of information - and, the use of such special software may itself result in ESI that is relevant to the criminal investigation.  FBI agents in this case have consulted on computer forensic matters with law enforcement officers with specialized knowledge and training in computers, networks, and Internet communications.  In particular, to properly retrieve and analyze electronically stored (computer) data, and to ensure accuracy and completeness of such data and to prevent loss of the data either from accidental or programmed destruction, it is necessary to conduct a forensic examination of the computers.  To effect such accuracy and completeness, it may also be necessary to analyze not only data storage devices, but also peripheral devices which may be interdependent, the software to operate them, and related instruction manuals containing directions concerning operation of the computer and software.

## V.  <u>CONCLUSION</u>

36.  Based on the foregoing, I request that the Court issue the requested warrants.  Based on the foregoing, I believe there

is probable cause that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES are stored on the SUBJECT DEVICE.  I therefore request that the court issue a warrant authorizing a search of the listed SUBJECT DEVICE for the items more fully described in Attachment B hereto, incorporated herein by reference, and the seizure of any such items found therein.


_____
Garret Sumpter, Special Agent
Federal Bureau of Investigation


Subscribed to and sworn to me
via telephone on July 24, 2020.


_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

This affidavit is made in support of a search warrant for the Samsung Galaxy S8 blue smartphone, with IMEI 357497084070488, which is currently in the legal custody of FBI, Los Angeles Field Office.

## ATTACHMENT B

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations, namely, production of child pornography, in violation of 18 U.S.C. § 2251(a),(e): receipt/distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A),(b)(1); and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B),(b)(2) (collectively, the "SUBJECT OFFENSES"), namely:

a.   Child sexual abuse material ("CSAM"), as defined in 18 U.S.C. § 2256(8).

b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to CSAM, including but not limited to, documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving CSAM.

c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting,

trade, or transaction of any kind, involving CSAM.

d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2)(B).

e.   Any records, documents, programs, applications, materials, or items which are sexually arousing to individuals who are interested in minors, but which are not in and of involved in sexually explicit conduct.  Such material is commonly themselves obscene or which do not necessarily depict minors known as "child erotica" and includes written materials dealing with child development, sex education, CSAM, sexual abuse of children, incest, child prostitution, missing children, investigative techniques for child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

f.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to peer-to-peer file-sharing software.

g.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

h.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of

the Subject Offense/s, and forensic copies thereof.

   i. Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

    i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii.  evidence of the attachment of other devices;

    iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v.  evidence of the times the device was used;

    vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

    vii. applications, utility programs, compilers,

interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.  records of or information about Internet Protocol addresses used by the device;

        ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

    3.  In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

        a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search the SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search the SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained on the SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

25

iii.   The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of CSAM.

e.   If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data

falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device; but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i. The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j. After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.